JDN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| James John Hadges, | No. CV 04-0259-PHX-EHC (DKD) |
| Plaintiff, | **ORDER** |
| vs. | |
| Maricopa County, et al., | |
| Defendants. | |

Plaintiff James John Hadges sued Maricopa County and its sheriff, Joseph Arpaio, for medical negligence and violation of his civil rights under 42 U.S.C. § 1983 (Doc. #1).[1] Defendants filed their second Motion for Summary Judgment (Doc. #57), which the parties briefed (Doc. ##77, 85).  Also before the Court are Defendants' Motion to Strike (Doc. #88) and Plaintiff's Request for Judicial Notice (Doc. #81).

The Court will grant in part and deny in part the Motion to Strike, deny the Request for Judicial Notice, and deny the Motion for Summary Judgment.

**I.    Background**

Plaintiff's claims arose in September 2002, while he was in custody of the Maricopa County Sheriff's Office (MCSO) at the Madison Street Jail (Doc. #1, Am. Compl. ¶ 8).  On September 11, 2002, Plaintiff suffered severe injuries to both feet and was transported to the Maricopa Medical Center (MMC) for treatment.  His injuries included lacerations to his

---

[1]The Court dismissed Maricopa County Medical Center and Correctional Health Services from this action upon Defendants' Motion to Dismiss (Doc. #30).

hands and feet and several broken bones in his lower extremities (Doc. #78, Ex. A., Pl. Aff. ¶ 6).  Plaintiff alleged that instead of proceeding with the necessary treatment, MCSO employees transported Plaintiff back to the jail facility (Doc. #1, Am. Compl. ¶ 6).

Plaintiff claimed that from the date of his injury until March 2003, during which time he was in MCSO custody, he repeatedly requested treatment in writing for his injuries (id. ¶¶ 8-9).  In addition, Plaintiff's criminal attorney wrote letters to the MCSO and the county attorney's office requesting medical attention for Plaintiff (id. ¶ 9).  Plaintiff stated that he was seen by health care professionals on a few occasions; however, he received no meaningful treatment because Defendants denied him admittance to a hospital for treatment or surgery (id. ¶ 11).

Plaintiff provided more details in a subsequent affidavit, in which he claimed that on Friday, October 4, 2002, he saw Dr. Hany Hannallah, who scheduled Plaintiff for surgery the following Monday, October 7 (Doc. #45, Ex. A, Pl. Aff. ¶ 3).  As part of his preparation for surgery, on October 6, Plaintiff signed an NPO ("no food by mouth") order ensuring that he did not eat or drink anything prior to the operation (id. ¶ 4; Ex. D).  But the next day, jail personnel never transported Plaintiff to the hospital for his surgery (id. ¶ 5).

On March 3, 2003, a Notice of Claim was delivered to Defendants (Doc. #1, Am. Compl. ¶ 10).  Plaintiff claimed that the following week, Defendants retaliated against him by taking away his wheelchair, moving him out of the infirmary and into general population, and forcing him to walk in leg braces (id.).

Following his transfer to the Arizona Department of Corrections (ADC) on March 27, 2003, Plaintiff received surgery on one foot and is awaiting surgery on the other (id. ¶ 12).  Plaintiff claimed that as a result of the lack of treatment while in Defendants' custody, he may never walk again (id. ¶ 13).  The extent of his injuries has not yet been ascertained (id.).

Plaintiff filed this action in Maricopa County Superior Court (Superior Court Case No. CV2003-17334).  Count I of his Amended Complaint alleges medical negligence in violation of state law and Count II alleges a violation of Plaintiff's Fifth, Eighth, and Fourteenth Amendment rights under § 1983 (Doc. #1, Am. Compl. ¶¶ 14-21).  In his prayer

for relief, Plaintiff requested damages, attorney fees, and costs (id.).[2]  Defendants filed an answer and a demand for a jury trial (Doc. #1, Am. Answer; Doc. #2).  The case was then removed to the federal district court (id., Notice).

Defendants filed their first summary judgment motion and argued that (1) Arpaio is not liable for medical care in the county jail system, (2) Defendants cannot be liable under *respondeat superior*, and (3) Maricopa County was not deliberately indifferent to a serious medical need (Doc. #33).  Defendants' motion was denied (Doc. #53).  The Court held a scheduling conference and set discovery and dispositive-motions deadlines (Doc. #56).  Defendants then filed their second Motion for Summary Judgment (Doc. #57).  During briefing on the Motion, Plaintiff submitted a Request for Judicial Notice (Doc. #81), and Defendants filed a Motion to Strike (Doc. #88).

## II.   Second Motion for Summary Judgment

### A.   Defendants' Contentions

#### 1. Facts

In their separate Statement of Facts (Doc. #58, Defs.' Statement of Facts (DSOF)), which is supported by excerpts from the deposition of Dr. Hany Hannallah, a physician with Maricopa County Correctional Health Services (CHS) (id., Ex. A); the affidavit of Dr. Robert Kaye, a physician with the MMC (id. Ex. B); and the affidavit of Cynthia Wright, a nurse with CHS (id., Ex. C), Defendants set forth the following facts:

Hannallah's sole contact with Plaintiff was during an examination on October 4, 2002 (DSOF ¶ 1).  Hannallah did not schedule surgery for Plaintiff at this time because he was not a surgeon, had no surgical privileges, and lacked the authority to schedule surgeries (id. ¶¶ 3-4).  Nor did he order any transport for surgery or tell Plaintiff that Plaintiff was going to have surgery (id. ¶ 7).  Instead, Hannallah referred Plaintiff to a Board Certified Orthopedic

---

[2]Plaintiff was represented by counsel when this action was initiated in Superior Court. That attorney withdrew in April 2004 (Doc. #5).  Plaintiff proceeded *pro se* until he was appointed counsel in May 2005 (Doc. #26).  His appointed attorney withdrew in July 2008 (Doc. #69), and Plaintiff has since been acting *pro se*.

surgeon for evaluation (id. ¶ 5).

Hannallah was unaware that Kaye had previously treated Plaintiff or recommended surgery in September 2002 when Plaintiff received his injuries (id. ¶¶ 8-9).  According to Kaye, Plaintiff had "adamantly refused" to consent to surgery at that time (id. ¶ 11).  Four months after the incident that caused his injuries, Plaintiff changed his mind and demanded surgery by Kaye (id. ¶ 13).  By that time—January 2003—Plaintiff's condition was non-emergent and surgery was elective, and Kaye refused to operate because he found Plaintiff to be difficult (id. ¶¶ 14-15).  Kaye states that he was not aware of any instances where Plaintiff's treatment or a physician's order related to his care was interfered with by Maricopa County officers (id. ¶ 17).

Surgical referrals and scheduling are ordered by licensed medical providers, not the nursing staff (id. ¶ 24).  Accordingly, Nurse Wright was not responsible for scheduling surgeries, and she did not schedule surgery for Plaintiff (id. ¶ 22).  On October 4, 2002, Dr. Gerardo Gregorio, the jail's CHS primary physician, conferred with Wright about Plaintiff (id. ¶ 25).  Gregorio noted that Plaintiff was evaluated, surgery was recommended, and Gregorio planned to make "OR"  arrangements for October 7 (id. ¶¶ 26-27).

### 2.  Legal Arguments

Defendants seek summary judgment on the ground that the medical records and sworn statements from Plaintiff's treating physicians demonstrate the absence of a genuine issue of material fact (id. at 2-3).  They assert that evidence discovered since the prior summary judgment proceedings—i.e., the complete medical record—shows that the only reason Plaintiff did not receive surgery was because he refused consent (id. at 3).

Defendants submit the affidavit of Dr. Robert Kaye, who states that he treated Plaintiff in September 2002 after Plaintiff's initial injury and recommended immediate surgery, but Plaintiff refused the recommended treatment (id., Ex. B, Kay Aff. ¶¶ 5-6).  Defendants contend that Kaye's averment is supported by the medical records previously submitted by Plaintiff, which include a chart note from Dr. David L. Cherney documenting Plaintiff's refusal to have surgery (Doc. #57 at 5, referring to Doc. #45, Ex. C (Progress Note dated

10/23/02)).

Defendants also address the October incident. They rely on the deposition testimony of Dr. Hannallah, who states that he did not schedule surgery for Plaintiff, that he did not have authority to schedule surgeries, and that he did not sign a transport order for Plaintiff (Doc. #58, Ex. A, Hannallah Dep. 5:11-20; 6:8-16, April 4, 2008).   In his deposition, Hannallah confirms that he referred Plaintiff to a board certified surgeon for a surgical evaluation (id. 6:2-7, 9:13-16).

In further support, Defendants submit the affidavit of Cynthia Wright (id., Ex. C, Wright Aff.).  She attests that on October 4, she conferred with Dr. Gregorio, who noted in his Progress Notes that Plaintiff was "seen at the Orthopedic Clinic—recommends immediate hospitalization for surgery.  Cynthia Wright of Utilization/Admin aware.  Will keep patient in Infirmary and attempt to make OR arrangement on Monday, October 7.  Patient informed of treatment plan" (id. ¶ 8 & Ex. 1).  However, on October 7, Wright faxed Gregorio a memorandum informing him that on October 4 she spoke with "Dr. Hanula" and various other MMC physicians, who all agreed that Plaintiff was no longer a candidate for the surgery (id. ¶ 9 & Ex. 2).  Defendants argue that this memorandum documents that Wright learned surgery was contemplated but never happened, and that the surgical experts declined to authorize Plaintiff's surgery (Doc. #57 at 7).  Defendants maintain that this rebuts any claim that there was some sort of conspiracy to cover-up the failure to transport Plaintiff to surgery (id.).

As to the events beginning in January 2003, Kaye attests that surgery was medically indicated but by that time, Plaintiff's condition was no longer emergent; thus, the outcome of surgery would not be different if surgery were performed then or sometime later (Doc. #58, Ex. B, Kaye Aff. ¶ 9).  Defendants assert that Kaye refused to operate because Plaintiff was angry and had made accusations and complaints that were unsupported by the medical charts (Doc. #57 at 6).

Defendants argue that Plaintiff's own, self-serving affidavit is insufficient to overcome the "overwhelming evidence" that Plaintiff refused surgery and that was "the sole

1    reason surgery was never scheduled" (id. at 8-9).  Defendants conclude that there is no

2    evidence suggesting that any county employee did anything to interfere with Plaintiff's

3    treatment (id. at 10).

4              **B.    Plaintiff's Response**

5                   ***1. Facts***

6         Plaintiff's Statement of Facts (Doc. #78, Pl.'s Statement of Facts (PSOF)), includes

7    more background material.  It is supported by Plaintiff's own declaration and medical records

8    (id., Ex. A; Exs. 1-16), an excerpt form the Maricopa County Annual Report (id., Ex. B), and

9    various magazine and newspaper articles (id., Ex. C-G).

10        Plaintiff explains that he was housed in the Madison Street Jail after his arrest on

11   September 4, 2002 (PSOF ¶ 1).  On September 10, Plaintiff complained of chest pains and

12   was transported to Phoenix Memorial Hospital (id. ¶ 2).  Shortly after his arrival at the

13   hospital, in the early morning hours of September 11, Plaintiff jumped out his third story

14   window and suffered lacerations to his hands and feet and fractures to his feet (id. ¶ 3).

15   Plaintiff was immediately transported to St. Joseph's Hospital and seen by a trauma team (id.

16   ¶ 4).  Plaintiff did not refuse any treatment that was offered to him (id.).  He was stabilized

17   and transported to MMC that same day (id.).

18        Upon his arrival at MMC, several CT scans and x-rays were taken, which revealed

19   that Plaintiff incurred severe fractures in both feet (id. ¶ 5; Exs. 1-2). Also on September 11,

20   Dr. Kaye—a Board Certified Orthopedic surgeon—treated Plaintiff and recommended

21   surgery to repair the damage to his feet (id.).  According to Kaye, Plaintiff refused to undergo

22   surgery (PSOF ¶ 5).  A psychiatric consult was obtained but the psychiatrist stated that he

23   could not appropriately evaluate Plaintiff because he refused to answer questions (id.).

24   Plaintiff does not remember speaking to Kaye or to a psychiatrist, nor does he remember

25   refusing surgery (id.).

26        On September 12, additional CT scans and x-rays were taken, and Plaintiff was

27   examined by Dr. Amanda Wheeler (id. ¶ 6).  Wheeler advised Plaintiff of the risks of his

28   injuries, including permanent neurologic impairment, long-term paralysis, infection, and

1   death (id.).  Plaintiff does not recall refusing surgery at that time (id.).  The following day,

2   Plaintiff was discharged from MMC and transferred to the medical ward at the Madison

3   Street Jail (id. ¶ 7).

4          On October 4, Hannallah examined Plaintiff (id. ¶ 8).  Hannallah told Plaintiff that he

5   needed "urgent surgery to repair the damage to his feet," and that Plaintiff was going to be

6   transferred to MMC "on an emergency basis for surgery" (id.).  Shortly before midnight on

7   October 6, jail nurse Linda Rankin had Plaintiff sign an NPO order because he was scheduled

8   for surgery the next day, Monday October 7 (id. ¶ 9).  At 7:55 a.m. on October 7, another jail

9   nurse, Hollister, noted in the medical record that Plaintiff "remains NPO for surgery," and

10  she told Plaintiff that he was awaiting transport to MMC (id. ¶ 10).  Hollister explained post-

11  operative breathing techniques to Plaintiff (id.).  Jail personnel then failed or refused to

12  transport Plaintiff to MMC for surgery (id. ¶ 11).

13         At 1:37 p.m. on October 7, Nurse Wright faxed a memorandum to Dr. Gregorio (id.

14  ¶ 12).  In this memorandum, Wright stated that on October 4 she spoke to Hannallah and

15  another jail physician, Steinhauser, as well as MMC physicians Kaye, Hall, Schafer, and

16  Setzer (id.).  According to Wright, all physicians agreed that Plaintiff did not need to be

17  admitted for surgery (id.).  None of these physicians examined Plaintiff or spoke to him after

18  Hannallah's October 4 examination (id.).

19         On October 23, Plaintiff was seen by MMC physician Dr. David Cherney (id. ¶ 13).

20  Cherney was angry with Plaintiff because he believed Plaintiff refused the October 7 surgery

21  that had been arranged—with "great effort"—by Hannallah (id.).  Cherney stated that a

22  MCSO guard told him that Plaintiff refused to be transferred that day for surgery (id.).

23  Plaintiff informed Cherney that he did not refuse transport and he did not refuse surgery (id.).

24  There is no Medical Care Refusal Form signed by Plaintiff or any staff member indicating

25  that Plaintiff ever refused transport or surgery (id. ¶ 14).

26         On January 14, 2003, Kaye examined Plaintiff and agreed with Plaintiff's request for

27  surgery (id. ¶ 15).  Kaye recommended that an outside consultation be set for surgery (id.).

28  After this examination and his return to the jail, Plaintiff submitted an Inmate Medical

Request in which he claimed that Kaye refused to treat him (id. ¶ 16).  But on January 21, Plaintiff was examined again by Kaye, who indicated in his notes that Plaintiff was "amendable to" and requesting surgery; Kaye ordered labs and scheduled Plaintiff for another appointment to schedule surgery (id. ¶ 17).  Kaye examined Plaintiff again on February 4, and they both agreed to proceed with surgery (id. ¶ 18).  Kaye planned to schedule surgery for February 17, but the MCSO guards who were escorting Plaintiff interrupted the examination and took Plaintiff out (id.).  Kaye examined Plaintiff again on March 11, and told Plaintiff that he had planned on setting surgery for February 17, but the guards terminated the examination before arrangements could be made (id. ¶ 19).

Plaintiff was transferred from the jail to the ADC on March 26, 2003, after 204 days in the MCSO custody (id. ¶¶ 21-22).  In May, he was examined by Dr. Felix Jabczenski at St. Mary's Hospital in Tucson (id. ¶ 23). Jabczenski told Plaintiff that because so much time had elapsed, his foot problems would be difficult to correct but recommended surgery (id.). Jabczenski performed surgery on Plaintiff's left foot in July 2003 (id. ¶ 24).  Plaintiff continues to suffer extreme pain in both feet (id. ¶ 25).

Plaintiff's remaining Statement of Facts includes statements concerning (1) U.S. government reports on the conditions in the Maricopa County Jail System (id. ¶ 26), (2) Maricopa County settlements paid out to a former inmate and the estate of a deceased former inmate (id. ¶¶ 27-28), (3) multi-million dollar jury verdicts against Maricopa County and CHS in cases where inmates died in the county jail (id. ¶¶ 30-31), and (4) the revocation of a national health commission accreditation of the Maricopa County Jails (id. ¶ 32).

## 2. *Legal Argument*

Plaintiff argues that Defendants' motion fails because it is an improper motion for reconsideration, there is no "newly discovered evidence" presented, and there exist genuine issues of material fact precluding summary judgment (Doc. #77).  Plaintiff addresses the specific evidence concerning Hannallah, Kaye, and Wright, and he concludes that the record demonstrates liability on the part of Maricopa County and Sheriff Arpaio.

1

### a. Hannallah

2    First, Plaintiff contends that Hannallah's deposition testimony conflicts with his own

3    medical Progress Notes (id. at 10, 12).  He points to Hannallah's notes from October 4,

4    which include a detailed explanation of Plaintiff's injuries and the type of "urgent" surgery

5    he requires and states: "[p]atient will be sent on emergency basis to MMC for hospitalization

6    for the above described surgeries" (Doc. #78, Ex. 4).  Plaintiff argues that Hannallah's

7    deposition testimony—that he merely recommended surgery and was only sending Plaintiff

8    to the MMC for evaluation—is not supported by medical notes, which nowhere mention the

9    words "recommendation" or "evaluation" (id.).  Plaintiff concedes that Hannallah may not

10   have been responsible for writing the actual transport order for surgery but argues that such

11   a task would have been the responsibility of the MCSO or the CHS staff (id.).

12   Next, Plaintiff relies on (1) the October 6 NPO order presented to him by CHS for

13   preparation for surgery the following day (Doc. #78, Ex. 5), (2) the October 7 nurse's notes

14   indicating that Plaintiff "remains NPO for surgery" and that the nurse instructed Plaintiff on

15   post-operative breathing exercises (id., Ex. 6), and (3) Dr. Cherney's October 23 notes,

16   which documented that Dr. Hannalah, "[a]fter a great deal of effort," arranged for Plaintiff's

17   transfer to the hospital for surgery on October 7 (id., Ex. 8).  Plaintiff argues that this

18   evidence demonstrates Hannallah's intent to have Plaintiff transferred to the MMC for

19   surgery on October 7, and he asserts that there was no refusal on his part and no evidence of

20   an Inmate Refusal of Medical Care, a requirement under MCSO policy whenever an inmate

21   refuses medical care  (Doc. #77 at 11-12; Doc. #78, Ex. 9).

22

### b. Wright

23   As to Wright's involvement, Plaintiff argues that her assertions—that she spoke to

24   Hannallah and at least five other physicians who all decided at the last minute that Plaintiff

25   did not need surgery—are unsupported by any specific facts and there is no record of these

26   conversations in the medical file (Doc. #57 at 15).  He further argues that at that time none

27   of the physicians except Hannallah had examined Plaintiff, nor is there a record that the

28   others reviewed his medical chart (id. at 15-16).  Plaintiff notes that there are only affidavits

from Hannallah and Kaye, and neither of them support Wrights's assertions or even mention this last minute decision-making scenario (id. at 16).  Plaintiff contends that the copy of Wright's faxed memorandum is insufficient to support summary judgment and that instead, a reasonable jury could find that this memorandum was sent in an effort to cover up MCSO's failure to transport Plaintiff for his scheduled surgery (id.).

### c. Kaye

Plaintiff addresses the evidence related to Dr. Kaye, which primarily concerns whether surgery was delayed in early 2003 (id.).  Plaintiff argues that the complete record shows that Kaye intended to perform Plaintiff's surgery (id.).  Specifically, on February 4, Kaye noted that surgery will be scheduled for February 17, and that because Plaintiff could not stay today, he will return in a week (Doc. #78, Ex. 13).  And then on March 11, Kaye noted that the "last scheduled clinic appointment was to set up elective surgery.  He was hustled out of the clinic by guards" before arrangements were finalized (Doc. #78, Ex. 14).  Plaintiff submits that on this record, a jury could conclude that Kaye agreed to perform  surgery and would have done so had MCSO staff not interfered (Doc. #77 at 14).

### d. Maricopa County and the Sheriff

Lastly, Plaintiff contends that the evidence demonstrates Maricopa County's liability by its policy of condoning a widespread pattern of deliberate indifference to inmates' medical needs (id. at 18-20).  Plaintiff specifically argues that Arpaio exhibited a "policy of indifference" with regard to inmates and that his "'customs and usages' of inaction and omission have done nothing but embolden his subordinates to engage in" constitutional violations (id. at 21-22).  Plaintiff suggests that because the average length of incarceration for pretrial detainees is just sixty days, Defendants know that they need only "hide the ball" long enough for an inmate's health problems to fall to someone else (id. at 23).

### C.    Defendants' Reply

In their reply, Defendants contend that Plaintiff submits no factual evidence to support his "conclusory assertions" (Doc. #85 at 1).  They assert that it is appropriate to re-argue their Motion for Summary Judgment; that Plaintiff's statements in opposition are conclusory, self-

serving, and speculative; that Plaintiff's failure to remember declining surgery in September fails to create a material issue of fact; and that the evidence shows that Hannallah did not schedule surgery and that there was no denial of medical care to Plaintiff by Defendants (id. at 2-6).

Defendants insist that although Hannallah's medical notes "created some confusion with medical staff as to why [Hannallah] wanted Plaintiff [to] go to the hospital," this confusion does not create a genuine issue of material fact whether surgery was actually scheduled or whether Defendants denied access to surgery (id. at 2, 7). They ague that there is no evidence showing that Defendants participated in this confusion and Defendants imply that Plaintiff may have contributed to the confusion because he did not inform Hannallah that he had previously been seen by an orthopedist and refused surgery (in September immediately following his injury) (id. at 7). Defendants further argue that Wright's memorandum shows that any surgery procedure was re-evaluated by medical professionals and the record is devoid of any evidence of a transport order (id. at 7-8).

With regard to Plaintiff's reliance on Dr. Cherney's October 23 Progress Notes, Defendants contend that this evidence is hearsay and does not demonstrate that Cherney had personal knowledge of whether Hannallah scheduled surgery (id. at 8). They note that there is no affidavit from Cherney explaining why he believed Hannallah scheduled surgery (id.).

Defendants also contend that Plaintiff failed to demonstrate that he suffered any harm or injury as a result of the delay in surgery (id. at 11). Defendants point out that even after he received surgery from Dr. Jabczenski, he continued to suffer extreme pain; thus, any delay did not cause additional infliction of pain (id. at 12). And they assert that Plaintiff has not established liability against the County or Arpaio because his allegations are conclusory and his other submissions—newspaper articles and findings of fact from other proceedings—are inadmissible (id.).

Defendants submit a separate Reply and Objections to PSOF (Doc. #87). They dispute various PSOF and specifically object to PSOF ¶ 13, regarding Dr. Cherney's notes, and PSOF ¶¶ 26-32, regarding findings of fact in other proceedings and newspaper articles.

1   These objections are raised in Defendants' Motion to Strike (Doc. #88).  Because the Court

2   addresses the Motion to Strike *infra*, it will overrule these particular objections as

3   unnecessary.

4   **III.    Legal Standards**

5           **A.    Summary Judgment**

6           A court must grant summary judgment if the pleadings and supporting documents,

7   viewed in the light most favorable to the non-moving party, "show that there is no genuine

8   issue as to any material fact and that the movant is entitled to judgment as a matter of law."

9   Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under

10  summary judgment practice, the moving party bears the initial responsibility of presenting

11  the basis for its motion and identifying those portions of the record, together with affidavits,

12  that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477

13  U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

14          If the moving party meets its burden with a properly supported motion, the burden

15  then shifts to the opposing party to present specific facts that show there is a genuine issue

16  for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995);

17  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The opposing party need not

18  establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

19  factual dispute be shown to require a jury or judge to resolve the parties' differing versions

20  of the truth at trial."  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89

21  (1968). But conclusory allegations, unsupported by factual material, are insufficient to defeat

22  a motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

23  Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate

24  specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249;

25  Devereaux, 263 F.3d at 1076.

26          At summary judgment, the judge's function is not to weigh the evidence and

27  determine the truth but to determine whether there is a genuine issue for trial.  Summers v.

28  A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  In assessing whether a party

1    has met its burden, the court views the evidence in the light most favorable to the non-

2    moving party.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  Thus, any

3    reasonable doubts about the existence of a factual issue should be resolved against the

4    moving party.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th

5    Cir. 1987).

6             **B.**      **Fourteenth Amendment and Medical Care**

7          As a pretrial detainee, Plaintiff is protected by the Fourteenth Amendment's Due

8    Process Clause, which establishes that "detainees have a right against jail conditions or

9    restrictions that 'amount to punishment.'"  Pierce v. County of Orange, 526 F.3d 1190, 1205

10   (9th Cir. 2008).  The Fourteenth Amendment standard is more protective than the Eighth

11   Amendment; "[t]his standard differs significantly from the standard relevant to convicted

12   prisoners, who may be subject to punishment so long as it does not violate the Eighth

13   Amendment's bar against cruel and unusual punishment."  Id.; Jones v. Blanas, 393 F.3d

14   918,  931 (9th Cir. 2004).  Although a pretrial detainee's right to receive adequate medical

15   care derives from the substantive Due Process Clause of the Fourteenth Amendment, Gibson

16   v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing Bell v. Wolfish, 441 U.S.

17   520, 535 (1979)), it is difficult to apply the "punishment" standard to medical care claims in

18   the same manner it is applied to conditions-of-confinement claims.  See Pierce, 526 F.3d at

19   1206-1213 (addressing detainees' claims regarding reading materials, telephone access,

20   holding cells, exercise, and other conditions at the county's jail facilities).  Under the Due

21   Process Clause, however, a detainee is protected against conditions or conduct—including

22   conduct related to medical treatment—that is arbitrary or purposeless.  See id. at 1205 (if a

23   particular condition or restriction is arbitrary or purposeless, a court may infer that the

24   purpose of the action is punishment that may not be inflicted on pretrial detainees) (citing

25   Bell, 441 U.S. at 539).  And the Due Process Clause, at a minimum, imposes the same duty

26   to provide adequate medical care to those incarcerated as imposed by the Eighth Amendment.

27   Gibson, 290 F.3d at 1187.  Therefore, the Eighth Amendment standards governing medical

28   care may be applied.  See Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998); Jones v.

1  Johnson, 781 F.2d 769, 771 (9th Cir. 1986) ("the eighth amendment guarantees provide a

2  minimum standard of care for determining [the plaintiff's] rights as a pretrial detainee,

3  including his right to medical care").

4          To establish a § 1983 claim for violation of the Eighth Amendment based on

5  inadequate medical care, a plaintiff must demonstrate "acts or omissions sufficiently harmful

6  to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S.

7  97, 106 (1976). This requires the plaintiff to satisfy both the objective and subjective

8  components of a two-part test. Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002). First,

9  he must demonstrate that he suffered a serious medical need. Jett v. Penner, 439 F.3d 1091,

10  1096 (9th Cir. 2006). Indications that a prisoner has a "serious" need for medical treatment

11  include the existence of an injury that a reasonable doctor or patient would find important

12  and worthy of comment or treatment, the presence of a medical condition that significantly

13  affects an individual's daily activities, or the existence of chronic and substantial pain.

14  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds,

15  WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

16          Second, the plaintiff must show that the defendant's response to that serious medical

17  need was deliberately indifferent. "[D]eliberate indifference to a prisoner's serious medical

18  needs is the 'unnecessary and wanton infliction of pain.'" Estelle, 429 U.S. at 104-05. An

19  official is deliberately indifferent if he both knows of and disregards an excessive risk to an

20  inmate's health. Farmer, 511 U.S. at 837. Mere negligence or medical malpractice does not

21  establish a sufficiently culpable state of mind. Broughton v. Cutter Labs., 622 F.2d 458, 460

22  (9th Cir. 1980). At the same time, a prisoner does not have to prove that he was completely

23  denied medical care in order to demonstrate deliberate indifference. Lopez v. Smith, 203

24  F.3d 1122, 1132 (9th Cir. 2000). Deliberate indifference may be shown when an official

25  denies, delays, or intentionally interferes with treatment or by the way that a medical

26  professional provides care. Jett, 439 F.3d at 1096. A difference of medical opinion,

27  however, is insufficient to establish deliberate indifference. Toguchi v. Chung, 391 F.3d

28  1051, 1058 (9th Cir. 2004).

1   Prison or jail officials who are not physicians may still be liable for deliberate
2   indifference if they intentionally deny or delay access to medical care. Estelle, 429 U.S. at
3   104-05. Also, "a prison official acts with deliberate indifference when he ignores the
4   instructions of the prisoner's treating physician or surgeon." Wakefield v. Thompson, 177
5   F.3d 1160, 1165 (9th Cir. 1999); see also Ortiz v. City of Imperial, 884 F.2d 1312, 1313-14
6   (9th Cir. 1989) (per curiam). A delay in surgery, specifically, can constitute deliberate
7   indifference to a serious medical need if the delay causes significant harm and if the
8   defendant should have known such harm would result from the delay. See McGuckin, 974
9   F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.
10  1987).

11  **IV.    Analysis**

12      **A.    Defendants' Motion to Strike and Plaintiff's Request for Judicial Notice**
13      Defendants seek to strike portions of PSOF, some of Plaintiff's references in his
14  declaration and response, and the medical notes (Doc. #88). Also, Defendants argue that
15  Plaintiff failed to comply with Local Rule of Civil Procedure 56.1(b) because he failed to
16  controvert DSOF with corresponding numbered paragraphs in his PSOF (id. at 6-7).

17      Plaintiff opposes the motion and asserts that his declaration is based on personal
18  knowledge and that the newspaper articles should be admissible because they are evidence
19  of a material fact, the best evidence he can procure, and admission serves the interests of
20  justice (Doc. #91 at 2, 5). Plaintiff argues that the findings of fact issued by Judge Wake in
21  the Hart v. Hill case, which has been renamed Graves v. Arpaio, CV 77-0479-PHX-NVW
22  (D. Ariz. Oct. 22, 2008), is evidence of Defendants' conduct regarding medical care at the
23  jail (id. at 6-7). On these grounds, and under Federal Rule of Evidence 201, Plaintiff requests
24  that the Court take judicial notice of facts set out in these articles and Judge Wake's findings
25  (Doc. #81).

26      Defendants' Motion to Strike will be granted in part and denied in part. The medical
27  records and notes are admissible under Federal Rule of Evidence 803(6). To the extent that
28  Defendants seek to strike any statements connected to these records, their Motion is denied.

1    In light of Plaintiff's *pro se* status and his otherwise thorough and well-written opposition
2    brief, which is supported by documentary evidence, the Court will deny the request to
3    consider DSOF as undisputed due to a technical noncompliance with the Local Rules.  See
4    Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988); see also
5    Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

6         The newspaper articles proffered by Plaintiff, however, are inadmissible.  See Larez
7    v. City of Los Angeles, 946 F.2d 630, 642-43 (9th Cir. 1991) (newspaper articles,
8    unsupported by corroborating evidence, are generally inadmissible hearsay).

9         Judicial notice of court records is routinely accepted**.  See, e.g.**, Valerio v. Boise
10   Cascade Corp., 80 F.R.D. 626, 635, n. 1 (N.D.Cal. 1978); Fed. R. Evid. 201(b).  But the
11   Findings of Fact and Conclusions of Law in the Graves action specify that its findings relate
12   only to the jail conditions during the evidentiary period from July 1, 2007 through May 31,
13   2008.  Graves, Doc. #1634 at 5-6, CV 77-0479-PHX-NVW (D. Ariz. Oct 22, 2008).  Thus,
14   the Findings of Fact do not constitute evidence of medical care at the jail during Plaintiff's
15   confinement.  Because the newspaper articles are inadmissible and the Graves records are
16   not relevant, Plaintiff's Request for Judicial Notice will be denied.

17        **B.     Appropriateness of Second Motion for Summary Judgment**

18        After the Court denied Defendants' Motion for Summary Judgment (Doc. #53), a Rule
19   16 Scheduling Conference was held, at which time the Magistrate Judge set a new
20   dispositive-motions deadline (Doc. #56).  Defendants filed their second Motion for Summary
21   Judgment within that new deadline (Doc. #57, filed April 4, 2008).  Therefore, Defendants'
22   pending Motion is not considered a motion for reconsideration, and any evidence—whether
23   previously available or not—is properly presented with this second Motion.

24        **C.     Deliberate Indifference**

25        Plaintiff's Amended Complaint concerns his medical care for the duration of his time
26   in MCSO custody—from September 2002 through March 2003 (Doc. #1, Am. Compl. ¶¶ 9,
27   14-21).  But his medical care claims stem from three distinct events during that period: (1)
28   the initial treatment following the September 2002 injury; (2) the alleged interference with

Plaintiff's October 7, 2002 surgery; and (3) the alleged delay in surgery from January 2003 until his transfer to ADC in March.  The Court will address the summary judgment arguments specific to each of these events.

As a threshold matter, the Court finds that Plaintiff suffered a serious medical need. The record demonstrates that the injuries to his feet were serious and worthy of treatment, significantly affected his daily activities, and caused substantial pain.  And Defendants present no argument to the contrary.  Plaintiff therefore satisfies the objective component of the deliberate indifference analysis.

### 1. September 2002

The parties dispute whether Plaintiff was denied surgery immediately following his September 11, 2002 injury.  Plaintiff contends that MCSO employees transported him back to the jail before he could receive the necessary treatment (Doc. #1, Am. Compl. ¶ 6). Defendants rely on Kaye's averment that Plaintiff refused surgery in September (Doc. #58, Ex. B, Kaye Aff. ¶ 6).  Attached to Kaye's affidavit is a copy of the January 14, 2003 Progress Note completed by Kaye, which includes a medical history of Plaintiff's injury (id., Ex. 1). The Progress Note documents that Plaintiff refused recommended surgical treatment following his injury, but it also notes Plaintiff's assertion that he had been requesting surgery ever since his initial injury (id.).  And Plaintiff avers that he does not recall refusing surgery in September (Doc. #78, Ex. A, Pl. Decl. ¶¶ 8-9).

Because the evidence and all inferences must be construed in Plaintiff's favor, there is a factual dispute precluding summary judgment on Plaintiff's claim arising in September.

### 2. October 2002

The parties dispute whether Plaintiff was scheduled to have surgery on October 7, and they both rely on the medical records to support their contentions.  Defendants' contentions that Hannallah only recommended an evaluation from a board certified surgeon are not supported by his own Progress Notes (see Doc. #58, Ex. A, Ex. 1).  When making an inference in Plaintiff's favor, as the Court must do on summary judgment, it appears that on October 4, Hannallah intended, or at the least, recommended, that Plaintiff be sent to the

1   MMC immediately for surgery.  And the nurses' notes on October 6-7, which show that

2   Plaintiff was prepped for surgery, support this inference.

3        The inference is further supported by Cherney's subsequent report that Hannallah

4   went to a lot of trouble to arrange for Plaintiff's transfer to the hospital on October 7 but that

5   Plaintiff, according to a guard, refused transport (Doc. #78, Ex. 8).  It does not matter that

6   there is no affidavit from Cherney explaining why he believed this information; the medical

7   record is admissible and is sufficient to raise a genuine issue of material fact as to the reason

8   why Plaintiff was not transported to the hospital.

9        Whether or not Hannallah actually scheduled surgery or not and whether he signed

10  a transport order is immaterial.  His Progress Notes state that Plaintiff will be sent to the

11  hospital on an emergency basis; even if this was for some reason other than for surgery, it

12  is still a physician's directive regarding care for an inmate's serious medical condition.  As

13  mentioned, officials are deliberately indifferent if they ignore instructions from an inmate's

14  physician. <u>Wakefield</u>, 177 F.3d at 1165.  Moreover, Defendants submit no evidence showing

15  who is required to sign transport orders or, specifically, that MCSO staff are not responsible

16  for transporting inmates to the hospital.  According to MCSO Policy DQ-1, Inmate Medical

17  Services, which Plaintiff submitted with his opposition, it appears that transport orders are

18  completed by the charge nurse (Doc. #78, Ex. 9 ¶ 5(A)).  But regardless, it is apparent that

19  transportation of inmates to the hospital is coordinated by jail personnel, not physicians.

20  Here, Plaintiff avers that he did not refuse treatment or transport on October 7, and there is

21  no evidence of an Inmate Refusal of Medical Care (<u>see id.</u> ¶ 11 (requiring such form signed

22  by inmate or staff member if inmate refuses to sign)).

23       With regard to Wright's memorandum, it is notable that despite this facsimile that

24  various physicians were contacted and agreed that Plaintiff was not a candidate for surgery,

25  there is no evidence of a contemporaneously made record in Plaintiff's medical records

26  documenting a reevaluation that resulted in a change in medical opinion.  The Court further

27  notes that Defendants' contention—supported by this evidence—that there was no October

28  7 surgery because the "surgical experts declined to authorize surgery" (Doc. #57 at 7),

1   contradicts their other argument that "surgery was not performed *soley* because Plaintiff

2   refused consent" (id. at 3) (Defendants' emphasis).

3       In support of their claim that Plaintiff did not suffer significant harm as a result of a

4   delay in surgery, Defendants submit Kaye's averment that Plaintiff's condition was no longer

5   emergent and that his chances for a successful outcome were no greater in January 2003 than

6   at a later date (Doc. #58, Ex. B, Kaye Aff. ¶ 9). But this averment specifically refers to

7   Plaintiff's condition in January 2003, three months later; there is no indication whether

8   surgery was emergent in October 2002 and whether surgery at that time would have

9   improved the chances for success. Defendants also rely on Plaintiff's own statement that

10  even after his surgery, he continues to suffer extreme pain (Doc. #85 at 12; Doc. #78, Ex. A,

11  Pl. Aff. ¶ 26). They argue that because he still suffers pain after surgery, "any alleged delay

12  in medical treatment did not cause Plaintiff additional unnecessary infliction of pain or

13  worsen his condition" (id.). This illogical medical conclusion proffered by counsel is not

14  supported by any medical evidence and cannot be considered on summary judgment. See

15  Estrella v. Brandt, 682 F.2d 814, 819-20 (9th Cir. 1982) (arguments made in legal

16  memoranda are not evidence). The scarce evidence going to whether the delay may have

17  caused significant harm is Plaintiff's sworn statement that Dr. Jabczenski advised him that

18  his foot problems would be difficult to correct because so much time had elapsed and

19  Jabczenski's May 22, 2003 medical report documenting that such "problems are always

20  difficult to correct later" (Doc. #78, Ex. A, Pl. Decl. ¶ 24 & Ex. 15).

21      In sum, there is a dispute between the parties, and competing arguments presented by

22  Defendants, as to the reason Plaintiff was not transported to the hospital on October 7. On

23  summary judgment, the Court does not weigh the evidence or determine the truth of the

24  matters asserted but only determines whether there is a genuine issue of material fact that

25  must be resolved by trial. Summers, 127 F.3d at 1152. A reasonable trier of fact could infer

26  that (1) MCSO staff were responsible for transporting Plaintiff to the hospital in October

27  2002; (2) they failed to do so, despite a physician's instruction that he be sent to MMC on

28  an emergency basis and his preparation for surgery; and (3) Plaintiff was significantly

1  harmed as a result.  Consequently, there exists a genuine issue of material fact whether there
2  was deliberate indifference to Plaintiff's serious medical needs in October 2002.

3  ### *3. January-March 2003*

4  Again, the parties both point to the medical records and argue that the evidence
5  supports their version of the facts.  The pertinent evidence includes Kaye's Progress Notes
6  from his four examinations of Plaintiff on January 14 and 21, February 4, and March 11
7  (Doc. #78, Ex. A, Exs. 10, 12-14).  Although Kaye initially recommended an outside
8  consultation for surgery (id., Ex. 10), by January 21, he noted that Plaintiff was amenable to
9  surgery and he ordered labs for surgery (id., Ex. 12).  And on February 4, Kaye specifically
10 noted that surgery will be scheduled for February 17, if possible (id., Ex. 13).  Then at their
11 final meeting, Kaye documented that the previous appointment was to set up surgery but
12 Plaintiff "was hustled out of the clinic by the guards before formal and final arrangements
13 could be completed" (id., Ex. 14).

14 Kaye attests that as his January 14 Progress Notes indicate, "[Plaintiff's] condition
15 was *not emergent* in January, 2003, and chances for a successful outcome were no greater
16 in January, 2003 than they would have been at a later date" (Doc. #58, Ex. B, Kaye Aff. ¶ 9)
17 (Defendants' emphasis).  But there is nothing in the January 14 Progress Note suggesting that
18 Plaintiff's condition was not emergent (id., Ex. 1).  It was not until two months later, at the
19 March 11 appointment, that Kaye reported Plaintiff's condition was not emergent (Doc. #58,
20 Ex. A, Ex. 14).  And as set out in the medical notes, prior to that March 11 appointment,
21 Kaye was planning to schedule surgery for Plaintiff—on February 17—but arrangements
22 could not be made because Plaintiff's guards took him out of the clinic (id.).  Plaintiff avers
23 that these "guards" were MCSO guards who were escorting him and that they interrupted his
24 examination and made him leave (id., Ex. A, Pl. Decl. ¶ 21).

25 Kaye attests that he never scheduled surgery for Plaintiff and he is not aware of any
26 instance in which an MCSO agent interfered with Plaintiff's care (Doc. #58, Ex. B, Kaye
27 Aff. ¶¶ 3, 12-13).  The Progress Notes, however, explain why surgery was not scheduled.
28 And Kaye's averment that he was not aware of any interference appears to contradict his own

1    notes that the guards hustled Plaintiff out before final surgery arrangements could be made.

2          Plaintiff submits that Kaye intended to perform surgery on February 17, and would

3    have done so if not for MCSO staff, who interfered with his examination (Doc. #77 at 14-

4    15).  Defendants assert that prison officials should be given wide deference in executing

5    policies necessary to preserve order and maintain security (id.).  While this last point is

6    correct, there is no affidavit or any other evidence explaining the security need that required

7    Plaintiff's medical examination to be cut short.  Thus, there is no evidence demonstrating that

8    the MCSO staff's conduct was reasonably related to a legitimate goal or that it was not

9    arbitrary or purposeless.  See Pierce, 526 F.3d at 1205.

10          On this record, there is a genuine issue of material fact as to whether there was

11    unlawful interference with Plaintiff's medical treatment and surgery.

12          **D.    Maricopa County and Arpaio Liability**

13          In their Motion for Summary Judgment, Defendants did not address the issue of

14    municipal or supervisory liability on the part of Maricopa County and Arpaio.  Rather,

15    Defendants' sole ground for summary judgment is that no individual employed by the

16    County or on Arpaio's staff interfered with Plaintiff's treatment (see Doc. #57).  While

17    Defendants present argument in their reply that Plaintiff cannot establish liability because he

18    has not demonstrated a causal connection between Arpaio or the County and the alleged

19    deprivation, the Court will not consider arguments raised for the first time in a reply

20    memorandum, particularly when the Plaintiff did not get an opportunity to respond to their

21    liability argument.[3]  See Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003)

22    (declining to consider an issue raised for the first time in a reply brief).

23          The Court has already determined there are material factual disputes over whether

24    there was interference with Plaintiff's medical treatment and surgery.  Defendants have

25    previously explained that under state law, Maricopa County is responsible for providing

26

27          [3]Even though Plaintiff made contentions in his response memorandum about
28    Defendants' liability (Doc. #77 at 18-21), he had no opportunity to respond to Defendants'
     specific liability argument in their reply.

1    medical care to inmates incarcerated in the jails (Doc. #33 at 3-4).  See Ariz. Rev. Stat. § 11-

2    291.  And the responsibility of operating the jails is placed by law upon the sheriff.  See Ariz.

3    Rev. Stat. §§ 11-441(A)(5) & 31-101.  Plaintiff claims that MCSO guards interfered with his

4    medical treatment and that jail personnel failed to transport him to the hospital for surgery

5    pursuant to his physician's orders.  Consequently, viewing the evidence in the light most

6    favorable to Plaintiff, there is a material question of fact whether Maricopa County and

7    Arpaio are liable for deliberate indifference with respect to  Plaintiff's medical care.

8    **V.    Retaliation Claim**

9         In his Complaint, Plaintiff alleged that after he filed his Notice of Claim and it was

10   delivered to Defendants, they retaliated against him by taking away his wheelchair, moving

11   him out of the infirmary and into general population, and forcing him to walk in leg braces

12   (Doc. #1, Am. Compl. ¶ 10).  Plaintiff is protected from "arbitrary state action," including

13   retaliation, under the First Amendment.  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995)

14   (citing Sandin v. Conner, 515 U.S. 472, 487-88 n. 11 (1995)); see also Hines v. Gomez, 108

15   F.3d 265, 269 (9th Cir. 1997).

16        Although Plaintiff  did not refer to the First Amendment in his Amended Complaint,

17   he alleged that he was punished for filing this lawsuit.   Under Federal Rule of Civil

18   Procedure 8, these allegations satisfy the minimal notice pleading requirements for a First

19   Amendment retaliation claim.  Alvarez v. Hill, 518 F.3d 1152, 1157 (9th Cir. 2008); Austin

20   v. Terhune, 367 F.3d 1167, 1172 (9th Cir. 2004).  It does not matter that Plaintiff's Amended

21   Complaint was filed with assistance of counsel.  In Austin,  the Ninth Circuit found that the

22   prisoner-plaintiff's amended pleading, which was filed with counsel yet "woefully inartful,"

23   sufficiently alleged a retaliation claim because the facts alleged punishment for filing a

24   grievance.  Austin, 367 F.3d at 1172 & n. 2.  Like here, the pleading in Austin did not refer

25   to the First Amendment.  But the Court determined that the allegations "at least minimally

26   informed the parties and the court of Austin's retaliation claim."  Id. at 1172.

27        On this precedent, the Court must recognize Plaintiff's First Amendment retaliation

28

claim.[4]   Because Defendants did not address this claim in their Motion for Summary Judgment, it survives summary judgment.

**VI.     Conclusion**

Defendants' Motion for Summary Judgment on Plaintiff's § 1983 medical claims will be denied.  These claims, as well as Plaintiff's First Amendment retaliation claim, will go forward.  And because Defendants' Motion does not address the claim set forth in the First Cause of Action in the Amended Complaint—medical negligence under state law—that claim also remains.

**IT IS ORDERED:**

(1)  The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. #57), Defendants' Motion to Strike (Doc. #88), and Plaintiff's Request for Judicial Notice (Doc. #81).

(2) Defendants' Motion to Strike (Doc. #88) is **granted** in part and **denied** in part as set forth in this Order.

(3) Plaintiff's Request for Judicial Notice (Doc. #81) is **denied**.

(4)  Defendants' Motion for Summary Judgment (Doc. #57) is **denied**.

(5) The remaining claims are Plaintiff's § 1983 medical claims and  retaliation claim and his state-law medical negligence claim.

DATED this 27th day of March, 2009.


_____
Earl H. Carroll
United States District Judge

----

[4]The Court notes that due to removal of this case from the superior court, the Amended Complaint was not screened by the district court, a process that often fleshes out claims in prisoner civil rights actions.